Christopher J. Fahy (*pro hac vice pending*)
Christopher.Fahy@quarles.com
Quarles & Brady LLP
300 North LaSalle Street
Suite 4000
Chicago, Illinois 60654
Phone: (312) 715-5000

Attorney for Defendant/Counterplaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ROTHSCHILD DIGITAL MEDIA INNOVATIONS, LLC,

Plaintiff/Counterdefendant,

v.

SONY COMPUTER ENTERTAINMENT AMERICA LLC,

Defendant/Counterplaintiff.

Case No. 5:14-CV-03928-PSG

**DECLARATION OF CHRISTOPHER J. FAHY IN SUPPORT OF DEFENDANT'S MOTION FOR RULE 11 SANCTIONS**

I, Christopher J. Fahy, declare as follows:

1. I am an attorney with Quarles & Brady LLP, 300 N. LaSalle Street, Suite 4000, Chicago, Illinois 60654. I am admitted to practice law in the State of Illinois and in the State of Wisconsin. I have personal knowledge of all facts set forth in this declaration, and I would, and could, testify competently thereto if called upon to do so.

2. A true and accurate copy of the April 2, 2014, letter I sent to John Carey, counsel for Rothschild Digital Media Innovations, LLC, is attached hereto as Appendix 1.

3. A true and accurate copy of the April 9, 2014, letter I received from Mr. Carey in response to my correspondence of April 2, 2014, is attached hereto as Appendix 2.

4. A true and accurate copy of the April 23, 2014, letter I sent to Mr. Carey is attached hereto as Appendix 3.

5. A true and accurate copy of the May 20, 2014, letter I received from Mr. Carey in response to my correspondence of April 23, 2014, is attached hereto as Appendix 4.

6. A true and accurate copy of the Response dated October 14, 2008, filed by Rothschild Trust Holdings, LLC ("Rothschild Trust"), in *Ex Parte Rothschild*, No. 90/008,591 is attached hereto as Appendix 5.

7. A true and accurate copy of the Final Office Action dated November 13, 2008, issued in *Ex Parte Rothschild*, No. 90/008,591 is attached hereto as Appendix 6.

8. A true and accurate copy of the Appeal Brief dated March 13, 2009, filed by Rothschild Trust in *Ex Parte Rothschild*, No. 90/008,591 is attached hereto as Appendix 7.

9. A true and accurate copy of the Examiner's Answer dated September 24, 2009 filed in *Ex Parte Rothschild*, No. 90/008,591 is attached hereto as Appendix 8.

10. A true and accurate copy of the Reply Brief dated November 24, 2009, filed by Rothschild Trust in *Ex Parte Rothschild*, No. 90/008,591 is attached hereto as Appendix 9.

11. A true and accurate copy of the Decision on Appeal dated September 17, 2010, in *Ex Parte Rothschild*, No. 90/008,591 is attached hereto as Appendix 10.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true.

Dated: September 26, 2014.

*/s/ Christopher J. Fahy*

Christopher J. Fahy

# Appendix 1



300 North LaSalle Street
Suite 4000
Chicago, Illinois 60654-3422
Tel 312.715.5000
Fax 312.715.5155
www.quarles.com

***Attorneys at Law in:***
*Phoenix and Tucson, Arizona*
*Naples and Tampa, Florida*
*Chicago, Illinois*
*Milwaukee and Madison, Wisconsin*
*Washington, DC*
*Shanghai, China*

Writer's Direct Dial: 312-715-5107
E-Mail: christopher.fahy@quarles.com

April 2, 2014

**VIA E-MAIL (JCAREY@CAREYRODRIGUEZ.COM)**

John C. Carey, Esq.
Carey Rodriguez Greenberg O'Keefe, LLP
1395 Brickell Avenue, Suite 700
Miami, FL 33131

**RE: U.S. Patent No. 6,101,534 to Rothschild**

Dear John:

As you are aware, Quarles & Brady LLP represents Sony Computer Entertainment America LLC ("SCEA") concerning Rothschild Digital Media Innovations, LLC's ("Rothschild") accusation of infringement of U.S. Patent No. 6,101,534 ("the '534 Patent").

This letter addresses two issues relating to our discussions. First, in order for SCEA to evaluate any possible licensing arrangement with Rothschild, we need information from you concerning any prior license, settlement, assignment, or other written agreements concerning or encompassing this patent. We would appreciate receiving copies of those agreements at your earliest convenience.

Second, we have further reviewed the prosecution history of the '534 Patent in light of Rothschild's infringement allegations, and this review has revealed what appears to be a glaring problem with Rothschild's infringement theory. In particular, Rothschild's theory for the final element of Claim 1 is clearly at odds with arguments made by Rothschild's predecessor-in-interest, Rothschild Trust Holdings, LLC ("Rothschild Trust"), before the Board of Patent Appeals and Interferences ("BPAI"), as well as the ruling in that case.

As you are aware, the '534 Patent was subject to *ex parte* reexamination before the United States Patent and Trademark Office ("USPTO"). The focus during that proceeding was on the correct claim construction of:

> said remotely accessible, auxiliary site addresses being structured to be remotely accessed by said remote server assembly so as to

> initiate utilization of said select portions of said quantity of auxiliary site data by said local processor assembly in conjunction with said primary site data.

Under USPTO rules, the Examiner gave the claim language its broadest reasonable interpretation, asserting that "remotely accessed by the server" meant any type of direct or indirect access to the auxiliary site data by the remote server, and rejected the claims as anticipated by four separate references. In the appeal to the BPAI, Rothschild's predecessor-in-interest vigorously argued that the Examiner was incorrectly construing the term to include indirect access by the remote server and that the claims were limited to direct access of the auxiliary site addresses by the remote server without intervening steps.

Indeed, in the Appeal Brief, Rothschild Trust distinguished the cited prior art as teaching mechanisms by which the **local processor** accessed the auxiliary site data for the remote server:

> The Examiner has failed to establish that Appellant's specification supports the breadth of the Examiner's proposed claim construction. Unlike the teachings of [the prior art], which all provide mechanisms by which the utilization of data on a computer readable medium can be initiated when the remote server is not remotely accessing the auxiliary site addresses, the teachings of Appellant's disclosure do not describe a comparable mechanism.
>
> For example, reference is made to column 13, lines 59-61 of the '534 Patent, which states that 'only the remote server assembly 50 can access the auxiliary site data at the auxiliary site addresses.' Thus, according to the claimed invention, to initiate utilization, the remote server assembly must be remotely accessing the auxiliary site addresses (which are encoded in the computer readable medium). As noted above, the Examiner's claim construction encompasses situations in which the remote server assembly is not remotely accessing the auxiliary site addresses. Therefore, the Examiner has erred...

*Ex Parte Rothschild Trust Holdings, LLC*, No. 2010-003272, Reexam. Appeal Br. at 24 (Mar. 13 2009) (emphasis original) (hereinafter "*Ex Parte Rothschild*"). In response to the Examiner's opposing brief, Rothschild Trust further asserted that this language *does not* include the situation where a remote server assembly indirectly accesses the auxiliary site data by sending information to the local processor which then allows the local processor to access the auxiliary site data:

> [T]he Examiner somehow (without any evidence for support) believes that a remote server assembly accessing auxiliary site data (i.e., within the data storage assembly associated with the

> local processor assembly) is disclosed by sending some information that allows access. To 'allow access' is not the same as 'accessing'...Although the Examiner continues to set forth broad interpretations of the language at issue, these interpretations are not reasonable.

*Ex Parte Rothschild*, Appeal Reply Br. at 17 (Apr. 11, 2007) (emphasis original).

These arguments were ultimately found persuasive and adopted by the BPAI, which expressly held that:

> Since the language of claim 1 requires that the *encoded* auxiliary site addresses are *structured to be accessed by the remote server*, we find, according to that claim, that the addresses are directly accessed by the remote server. The scope of claim 1 does not cover encoded auxiliary site addresses that are structured to be accessed by a local processor or any other intermediary, ultimately resulting in the addresses being indirectly accessed by the remote server.

*Ex Parte Rothschild*, No. 2010-003272, slip op. at *9 (BPAI Sept. 17, 2010) (emphasis original). This claim construction was then relied upon by the BPAI in finding that the cited prior art did not anticipate the claims because each taught a mechanism whereby the DVD/CD-ROM data was in fact accessed by the local end-user's computer rather than directly by the remote server. *Id.* at 11-13.

In light of the above, we are puzzled by Rothschild's infringement allegation in the claim charts where it asserts that the final element of claim 1 is met by data from game discs or cards being mounted to the PlayStation Network *by the local game console*. *See* Claim Chart "Sony's Direct Infringement of U.S. Patent No. 6,101,534 to Rothschild" at 12 ("In the accused products, auxiliary site data residing on game discs or game cards is structured to be remotely accessed because it is made available (i.e., mounted) to PlayStation Network Servers from the local consoles, using the local console's IP address and internal file system structure."); *see* Claim Chart "Sony PSP and PlayStation Vita Direct Infringement of U.S. Patent No. 6,101,534 to Rothschild" at 12 ("The auxiliary site data is structured to be remotely accessed because it is made available to PlayStation Network servers from the local handheld consoles, using the consoles' network connection, IP address and internal file system structure.").

The accused process (the alleged mounting of data to the PlayStation Network by the local game console) clearly describes ***indirect*** access of the asserted auxiliary site addresses by the PlayStation Network. To the extent that there is "auxiliary site data" on game discs or cards within the meaning of the claims, the access to that data would be precisely the same as the access which Rothschild Trust and the BPAI made clear was not covered by the patent, i.e.,

Network to data on game discs or cards would obviously be indirect, not direct, just as was true with the prior art that Rothschild Trust distinguished.

In light of the above, SCEA is confused as to how Rothschild could possibly read the claims on the accused products, but would very much appreciate receiving your explanation so that it can evaluate the situation more fully. Accordingly, please provide your response to the points made above so we may continue our dialogue. To the extent you wish to discuss the forgoing, please contact me at your earliest convenience.

Very truly yours,

Christopher J. Fahy

# Appendix 2




1395 Brickell Avenue
Suite 700
Miami, FL 33131
(305) 372-7474
Fax (305) 372-7475
www.careyrodriguez.com

Miami | Boca Raton | Washington

*Via E-Mail*

April 9, 2014

Christopher Fahy, Esq.
Quarles & Brady, LLP
300 North LaSalle Street, Suite 4000
Chicago, Illinois 60654

*Re:* U.S. Patent No. 6,101,534 to Rothschild (the "'534 Patent")
***Confidential – Subject to Fed. R. Evid. 408***

Dear Mr. Fahy:

We are in receipt of your correspondence of April 2, 2014 (the "April 2 Letter") addressing two issues relating to the infringement allegations and licensing offer made by our client Rothschild Digital Media Innovations, LLC ("Rothschild") to your client Sony Computer Entertainment of America LLC ("Sony"). First, your April 2 Letter requests that Rothschild produce any prior licenses, settlements, assignments or written agreements concerning or encompassing the '534 Patent (the "Prior Licenses") which you suggest would assist Sony in its evaluation of a licensing arrangement. It is our understanding, however, that the Prior Licenses include confidentiality protections precluding their disclosure to third parties. Moreover, we do not believe disclosure of Prior Licenses to Sony would be meaningful here because they encompass fields of use not analogous to Sony's accused product and would therefore not serve as a relevant benchmark in Sony's licensing analysis.

More substantively, your April 2 Letter raises an issue regarding Rothschild's infringement allegations with respect to the last element of the '534 Patent's claim 1. In this regard, you assert that certain statements made during reexamination of the '534 Patent preclude Rothschild's infringement allegations against Sony. Specifically, you interpret claim 1, in light of the reexamination history, as limited to systems in which the remote server assembly directly accesses auxiliary site data, as opposed to systems in which the remote server assembly sends information to the local processor which then allows the local processor to access auxiliary site data. You then interpret the claim chart we provided as asserting that data from game discs or cards is "mounted to the PlayStation Network *by the local game console*." (April 2 Letter at 3.) Based on this interpretation, you claim that we have asserted indirect access of auxiliary site data by the remote server assembly, and you conclude that such indirect access does not infringe according to your reading of the reexamination history.

Your characterization of the claim chart is mistaken. To be clear, the claim chart does not state that the auxiliary site data are "made available (i.e. mounted) . . . by" the local game console. Rather, the claim chart states that the auxiliary site data are "made available (i.e. mounted) . . . from" the local game console. This hardly conflicts with the reexamination history. Having been inserted into the local game console, the game disc or card is obviously

located at, and must be made available from, the local game console – just as a CD or any other computer readable medium inserted into a local processor, as described and claimed in '534 Patent, is located at, and made available from, that local processor. After all, such portable media are not readable by any processor – remote or local – unless and until they are inserted or connected somehow. It is therefore inevitable that the remote server of the claimed system accesses auxiliary data from the local game console. Where else would the data be accessed?

Your apparent focus on the word "mounted" (which appears in parentheses after the words "made available" that you omit) is of no consequence either technically or legally. Technically, the word is a computing term of art that refers generally to the process by which an operating system detects, organizes (both in real and logical memory) and makes available (to users, the operating system and other remote systems) data that are present in permanent or removable storage devices. As discussed above, mounting the game disc or card is merely the inevitable precursor to the ability of any processor – remote or local – to access the auxiliary data stored on that disc or card. The mounting process is technically and temporally separate from the online multiplayer interaction and not, as you imply, part of the online multiplayer interaction. Legally, the word appears only in the claim chart that we provided as a courtesy to you in the hope of initiating a constructive dialogue, and as an alternative to immediately filing suit; the word does not appear in the claims and does not limit their scope.

Notably, the April 2 Letter is entirely devoted to analyzing the claim chart in light of the reexamination history. Absent is any variant description of how Sony's system actually operates. The letter simply states in conclusory fashion that "Network to data on game discs or cards would obviously be indirect, not direct." (April 2 Letter at 4.) And despite your claim that the reexamination distinguished a remote server assembly that "send[s] information to the local processor which then allows the local processor to access the auxiliary site date" (April 2 Letter at 2), you do not claim that Sony's PlayStation Network operates in such a manner.

Our belief that the accused products infringe is unshaken. Although our client remains interested in an amicable resolution of this matter, Sony has yet to respond to our client's settlement offer, which included a proposed framework for a licensing arrangement. Rothschild therefore requests that Sony respond to the pending settlement proposal within the next two weeks, or alternatively that Sony agree within that same time frame to scheduling an in-person meeting of parties and counsel at a mutually convenient time and place for the purpose of discussing proposed settlement terms.

Very truly yours,

John C. Carey

cc: Rothschild Digital Media Innovations, LLC

# Appendix 3



300 North LaSalle Street
Suite 4000
Chicago, Illinois 60654-3422
Tel 312.715.5000
Fax 312.715.5155
www.quarles.com

*Attorneys at Law in:*
*Phoenix and Tucson, Arizona*
*Naples and Tampa, Florida*
*Chicago, Illinois*
*Milwaukee and Madison, Wisconsin*
*Washington, DC*
*Shanghai, China*

Writer's Direct Dial: 312-715-5107
E-Mail: christopher.fahy@quarles.com

April 23, 2014

**VIA E-MAIL (JCAREY@CAREYRODRIGUEZ.COM)**

John C. Carey, Esq.
Carey Rodriguez Greenberg O'Keefe, LLP
1395 Brickell Avenue, Suite 700
Miami, FL 33131

**RE: U.S. Patent No. 6,101,534 to Rothschild**

Dear John:

This letter responds to your April 9, 2014 letter concerning Rothschild Digital Media Innovations, LLC's ("Rothschild") accusation of infringement of U.S. Patent No. 6,101,534 ("the '534 Patent") against Sony Computer Entertainment America LLC ("SCEA").

SCEA is willing to arrange a meeting with Rothschild so the parties can further discuss the situation. We would suggest a meeting at SCEA's offices in San Mateo, California during the week of May 26-30. Please let me know if any date during that week works for you and your client.

Also, we should continue our dialogue in advance of any meeting so that we make it as productive as possible. In this regard, the main substantive point of my April 2, 2014 letter was not meant to be the phrasing of Rothschild's claim charts. The point I was trying to make was that there is a clear disclaimer of subject matter in the reexamination file history. Specifically, as the Patent Board explicitly confirmed, Rothschild disclaimed "auxiliary site addresses ***that are structured to be accessed by a local processor or any other intermediary***, ultimately resulting in the addresses being indirectly accessed by the remote server." *Ex Parte Rothschild*, No. 2010-003272, slip op. at *9 (BPAI Sept. 17, 2010). Accordingly, any auxiliary site addresses that are accessed by a local processor (such as, for example, the processors on game consoles sold by SCEA) are obviously outside the scope of the patent.

In light of the above, we are trying to understand any good faith basis for Rothschild to allege that the accused products operate differently than what has been disclaimed. It is Rothschild's burden to show that the accused products infringe. However, the only theory

Rothschild has provided to date involves access to the alleged auxiliary site addresses that would only take place by one or more local processors. Your letter does not deny that this is true, but rather appears to confirm it.

You have stated that Rothschild has analyzed the accused products. What evidence does Rothschild have that the alleged auxiliary site addresses are accessed by remote servers in a way that is not disclaimed, i.e., not through the processors in the game consoles? SCEA is presently unaware of any such evidence. In order for SCEA to consider a license to the patent, it needs to understand Rothschild's theory as to how it can avoid the explicit disclaimer in the file history.

Finally, SCEA reiterates that it needs to receive information related to all of Rothschild's patent licenses. SCEA would not consider entering into a license of the Rothschild patent without this information, and such information would undoubtedly make an in-person meeting more productive. If there are confidentiality concerns, we would suggest that you begin by disclosing the identity of the licensees and some basic non-confidential information about the licenses (such as whether the licenses are single patent licenses or portfolio licenses), and then the parties can further discuss how to obtain permission for disclosure of the remaining information.

We would appreciate your response to the points made above so we may continue our dialogue. To the extent you wish to discuss, please contact me at your earliest convenience.

Very truly yours,

Christopher J. Fahy

# Appendix 4




1395 Brickell Avenue
Suite 700
Miami, FL 33131
(305) 372-7474
Fax (305) 372-7475
www.careyrodriguez.com

Miami | Boca Raton | Washington

*Via E-Mail*

May 20, 2014

Christopher J. Fahy, Esq.
Quarles & Brady LLP
300 North LaSalle Street, Suite 4000
Chicago, Illinois 60654

*Re:* U.S. Patent No. 6,101,534 to Rothschild (the "'534 Patent").
***Confidential – Subject to Fed. R. Evid. 408***

Dear C.J.:

This is in response to your letter of April 23, 2014. First, we respond to your suggestion of non-infringement based on a theory of prosecution history estoppel, and second, we address your request for information about prior licenses to the '534 Patent.

The '534 Patent's auxiliary site addresses reside in a compact, portable, and interchangeable computer readable medium. That computer readable medium itself resides in the data storage assembly. The data storage assembly is coupled to the local processor and the local processor is in data transmitting and receiving communication with the remote server assembly. *See* '534 Patent, col. 16, ll. 52-54. Sony's non-infringement theory is that Rothschild – through an explicit disclaimer – somehow "uncoupled" the data storage assembly from the local processor and placed the remote server assembly in "direct" access (presumably including data transmitting and receiving means) with the data storage assembly, outside the presence of a local processor.

We disagree. To establish estoppel, Sony would have the burden of proving that the patentee "clearly and unmistakably" made statements disavowing patent subject matter. *Salazar v. Procter & Gamble Co.*, 414 F.3d 1342, 1344 (Fed. Cir. 2005). Unilateral statements by the patent examiner (or here, the Board) cannot serve as a basis for estoppel. *Id.* at 1345 (holding that unilateral remark by patent examiner when stating reasons for allowance of claim cannot give rise to prosecution history estoppel). Your April 23 letter quotes a statement by the Board, not by Rothschild. Even if your interpretation of the statement were correct, the Board's statement cannot give rise to estoppel.[1]

[1] We do not agree with your interpretation of the Board's statement. The Board recognized that the patent covers a system where "'access by the local processor assembly . . . is directed by the remote server assembly.'" *Ex Parte Rothschild*, No. 2010-003272, slip op. 10 (B.P.A.I. Sept. 17, 2010) (quoting '534 Patent, col. 14, ll. 33-37).

Nor did Rothschild make any statement that would support your suggestion of estoppel. Neither in the '534 Patent's original prosecution nor during reexamination did Rothschild disclaim remote-server access to auxiliary site data while the auxiliary site data resides in a data storage assembly (*e.g.*, CD-ROM or DVD-ROM drive) that is itself housed within a local processor. Quite the contrary. In his reply brief before the Board, Rothschild reaffirmed the claimed invention as "a remote server assembly accessing auxiliary site data (*i.e.*, within the data storage assembly associated with the local processor assembly)." Reply Br. 17-18, *Ex Parte Rothschild*, No. 2010-003272 (B.P.A.I. Nov. 24, 2009). Notably, the state of the art did not then and does not now allow for a local data storage assembly (like a CD-ROM or DVD-ROM drive) to communicate with a remote server assembly without the aid of a local processor interface. There was no "clear[] and unmistakabl[e]" disclaimer by the patentee. *Salazar*, 414 F.3d at 1344.

Although your previous letter dated April 2, 2014 cited statements by Rothschild, no estoppel resulted from those statements either. Those statements, made in the context of establishing the proper claim construction of the phrase "to initiate utilization," merely distinguish the prior art cited by the examiner on the basis that the references disclose a mechanism "by which utilization of data on a computer readable medium can be initiated" locally (*i.e.*, without any interaction with a remote server assembly). *See* Appeal Br. 23-24, *Ex Parte Rothschild*, No. 2010-003272 (B.P.A.I. Mar. 13, 2009). The equivalent scenario here would be one where PlayStation users could engage in online multiplayer games without first going online and communicating with a remote server assembly. Obviously, that is not the case. Rather, we are concerned with PlayStation's online-play mode, in which the remote server accesses the local auxiliary data so as to permit utilization of select portions of those data in the presentation of a gaming experience to the user. That is an infringement of the '534 Patent.

The foregoing observations are not intended as an exhaustive recitation of grounds for opposing your suggestion of estoppel, but we believe they are more than sufficient to negate estoppel.

With respect to your request for prior licenses, it is our understanding that two licenses have been granted to the '534 Patent, both attendant to litigation settlements. In 2003, Rothschild sued InterActual Technologies, Inc. and Sonic Solutions, Inc. in the United States District Court for the Southern District of Florida, alleging infringement of the '534 Patent. *See Trust Licensing, LLC v. InterActual Techs., Inc.*, No. 03-cv-20672 (S.D. Fla. filed Mar. 31, 2003). The litigation ended in a confidential settlement pursuant to which Rothschild granted the defendants a non-exclusive license. The terms of the InterActual license allow Rothschild to refer only to the existence of a non-exclusive license.

In 2006, Rothschild sued Citrix Systems, Inc. and Citrix Online, LLC in the United States District Court for the Southern District of Florida, alleging infringement of the '534 Patent. *See Rothschild Trust Holdings, LLC v. Citrix Systems, Inc.*, No. 06-cv-21359 (S.D. Fla. filed Sept. 26, 2006). The litigation ended in a settlement pursuant to which Rothschild granted the

defendants a non-exclusive license. The terms of the Citrix license allow Rothschild to refer only to the existence of a non-exclusive license.

We believe the only way we would be able to disclose to SCEA more detail regarding the above two licenses would be as part of discovery in an infringement action and after a confidentiality order had been entered into between the parties. However, we do not believe SCEA's request for licensing information is a sufficient reason for litigation to be commenced. Moreover, the licenses requested have no realistic bearing on this discussion. The products and markets at issue in those cases were different from those at issue in the present dispute, and any effort to force a resolution of the current dispute into the mold of those prior licenses would be a needless distraction and likely counterproductive.

If you nonetheless insist on the expansion of our discussion to encompass the affairs of third parties, we would naturally be inclined to request the same sort of information from Sony. Rothschild would request disclosure of any patent-related license, settlement, assignment or other written agreement that Sony has entered in connection with PlayStation consoles, SCEA games or the PlayStation Network. To the extent such disclosure raises confidentiality concerns, we would of course be willing to enter an appropriate non-disclosure agreement, but initially would expect disclosure of at least the identity of the licensees and any non-confidential information about the licenses.

We hope you agree that third-party licenses are a burdensome and only marginally useful object of our mutual attention. Instead, we continue to believe that applying Rothschild's generously modest proposed royalty terms to publicly available sales figures can lead directly to a reasonable solution. Based on publicly available information, Sony's combined console (portable and set-top) sales in the United States amount to approximately 55 million units, representing over \$16.5 billion dollars in revenue using a blended per-console rate of \$299. Rothschild's terms of \$0.50 per console and \$0.05 per Sony game represent just 0.16% of the total sales of Sony's consoles in the United States and less than 0.006% of the total Sony sales of video games, consoles and PlayStation Network subscriptions. A case can be made for much higher numbers.

We look forward to the meeting on May 28. If you wish to discuss any of the foregoing matters before then, or any other issues, please contact me at your convenience.

Very truly yours,

John C. Carey for

cc: Rothschild Digital Media Innovations, LLC

# Appendix 5


64811 U.S. PTO



10/17/08 F:\MM DOCS\7-GEN\GEN 2007\7062-07 Rothschild\7062 Amendment FILED.doc

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Patentee: Leigh M. Rothschild

Control No.: 90/008,591

Filing Date: April 11, 2007

Patent No.: 6,101,534

For: INTERACTIVE, REMOTE, COMPUTER INTERFACE SYSTEM

Confirmation Number 7502
Customer Number 04219
Fleming, Fritz M., Examiner
Art Unit 3992

2800 S.W. Third Avenue
Historic Coral Way
Miami, Florida 33129
October 14, 2008

Mail Stop Ex Parte Reexam
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

**A M E N D M E N T**

Dear Sir:

In response to the Office Action dated August 28, 2008, please amend the above-referenced application as follows:

**Amendments to the Claims** begin on page **2** of this paper.

**Remarks** begin on page **11** of this paper.

**Appendix I**, attached hereto, includes the Status of the Claims and Support for Claim Changes

**Appendix II**, attached hereto, includes Declarations of Leigh M. Rothschild, Jay Howard Linn, and Peter A. Matos.

**Amendments to the Claims:**

This listing of claims will replace all prior versions, and listings, of claims in the application:

**Listing of Claims:**

1. (Original) An interactive, remote, computer interface system comprising:

a remote server assembly, said remote server assembly including a quantity of primary site data;

said remote server assembly including at least one primary site address, said primary site address including at least a portion of said primary site data and being distinct so as to identify a location thereof on a computer network;

a local processor assembly;

said local processor assembly being coupled in data transmitting and receiving communication with said remote server assembly;

said local processor assembly being structured to access said primary site address so as to achieve said data transmitting and receiving communication with said remote server assembly;

at least one data storage assembly associated with said local processor assembly and structured to contain a

quantity of auxiliary site data thereon, said auxiliary site data being associated with said primary site data;

said data storage assembly including a compact, portable and interchangeable computer readable medium;

said compact, portable and interchangeable computer readable medium including a plurality of remotely accessible, auxiliary site addresses encoded therein, each of said remotely accessible, auxiliary site addresses including select portions of said quantity of auxiliary site data; and

said remotely accessible, auxiliary site addresses being structured to be remotely accessed by said remote server assembly so as to initiate utilization of said select portions of said quantity of auxiliary site data by said local processor assembly in conjunction with said primary site data.

2. (Cancelled).

3. (Original) A system as recited in claim 1 further including a security protocol system, said security protocol system being structured to limit said remote server assembly's access to said local processor assembly by only permitting access to said compact, portable, interchangeable computer readable medium associated with said local processor assembly.

4. (Original) A system as recited in claim 1 wherein said remote server assembly is structured internal site and identify an internal site address of said compact, portable and interchangeable computer readable medium relative to said local processor assembly.

5. (Original) A system as recited in claim 4 wherein said remote server assembly is structured to signal a non-presence of said compact, portable and interchangeable computer readable medium.

6. (Original) A system as recited in claim 1 wherein said compact, portable and interchangeable computer readable medium is structured to identify an internal site address thereof relative to said local processor assembly, thereby facilitating access thereto by said remote server assembly.

7. (Original) A system as recited in claim 1 wherein said compact, portable and interchangeable computer readable medium is structured to store at least one video image.

8. (Original) A system as recited in claim 1 wherein said compact, portable and interchangeable computer readable medium is structured to store at least one audio signal.

9. (Original) A system as recited in claim 1 wherein said primary and said remotely accessible auxiliary site addresses include URL addresses accessible through an online connection.

10. (Original) A system as recited in claim 1 wherein said local processor assembly further includes a data entry assembly associated therewith and structured to provide for an input of at least a portion of said auxiliary site data into a corresponding one of said auxiliary site addresses of said compact, portable and interchangeable computer readable medium.

11. (Original) A system as recited in claim 10 further including a compression assembly structured to compress said auxiliary site data inputted by said data entry assembly onto said compact, portable and interchangeable computer readable medium.

12. (Original) A system as recited in claim 10 wherein said data entry assembly includes a receiver assembly structured to receive a remotely transmitted signal containing at least some of said auxiliary site data.

13. (Original) A system as recited in claim 12 wherein said remotely transmitted signal includes a full band broadcast signal.

14. (Original) A system as recited in claim 12 wherein said remotely transmitted signal includes an interlaced broadcast signal.

15. (Original) A system as recited in claim 12 wherein said remotely transmitted signal is transmitted to said receiver

assembly by a satellite transmitter.

16. (Original) A system as recited in claim 12 wherein said remotely transmitted signal is transmitted to said receiver assembly by a radio transmitter.

17. (Original) A system as recited in claim 12 wherein said remotely transmitted signal is transmitted to said receiver assembly by a cabled transmitter.

18. (Original) A system as recited in claim 17 wherein said cabled transmitter includes a telephone line.

19. (Original) A system as recited in claim 17 wherein said cabled transmitter includes a broadband cable.

20. (Original) A system as recited in claim 17 wherein said cabled transmitter includes a fiber optic cable.

21. (Original) A system as recited in claim 1 wherein said compact, portable and interchangeable computer readable medium is structured to store a plurality of operating instructions which direct an operation of said local processor assembly.

22. (Original) A system as recited in claim 21 wherein said local processor assembly includes an overlay processor and a direct view processor;

said operating instructions on said compact, portable and interchangeable computer readable medium are structured to direct said overlay processor to generate a floor plan

display of a three dimensional space at least partially from said quantity of auxiliary site data; and

said operating instructions on said compact, portable and interchangeable computer readable medium are structured to direct said direct view processor to generate a three dimensional, walk through display of the three dimensional space at least partially from said quantity of auxiliary site data.

23. (New) An interactive, remote, computer interface system comprising:

a remote server assembly, said remote server assembly including a quantity of primary site data;

said remote server assembly including at least one primary site address, said primary site address including at least a portion of said primary site data and being distinct so as to identify a location thereof on a computer network;

a local processor assembly;

said local processor assembly being coupled in data transmitting and receiving communication with said remote server assembly;

said local processor assembly being structured to access said primary site address so as to achieve said data transmitting and receiving communication with said remote

server assembly;

at least one compact portable and interchangeable computer readable medium associated with said local processor assembly and structured to contain a quantity of auxiliary site data thereon, said auxiliary site data being associated with said primary site data;

said compact, portable and interchangeable computer readable medium being distinct from a fixed hard drive of said local processor assembly;

said compact, portable and interchangeable computer readable medium including a plurality of remotely accessible, auxiliary site addresses encoded therein, each of said remotely accessible, auxiliary site addresses including select portions of said quantity of auxiliary site data; and

said remotely accessible, auxiliary site addresses being structured to be remotely accessed by said remote server assembly so as to initiate utilization of said select portions of said quantity of auxiliary site data by said local processor assembly in conjunction with said primary site data.

24. (Cancelled).

25. (Cancelled).

26. (New) An interactive, remote, computer interface system

comprising:

a remote server assembly, said remote server assembly including a quantity of primary site data;

said remote server assembly including at least one primary site address, said primary site address including at least a portion of said primary site data and being distinct so as to identify a location thereof on a computer network;

a local processor assembly;

said local processor assembly being coupled in data transmitting and receiving communication with said remote server assembly;

said local processor assembly being structured to access said primary site address so as to achieve said data transmitting and receiving communication with said remote server assembly;

at least one data storage assembly associated with said local processor assembly and structured to contain a quantity of auxiliary site data thereon, said auxiliary site data being associated with said primary site data;

said data storage assembly including a compact, portable and interchangeable computer readable medium;

said compact, portable and interchangeable computer readable medium including a plurality of remotely

accessible, auxiliary site addresses encoded therein, each of said remotely accessible, auxiliary site addresses including select portions of said quantity of auxiliary site data;

said remotely accessible, auxiliary site addresses being structured to be remotely accessed by said remote server assembly so as to initiate utilization of said select portions of said quantity of auxiliary site data by said local processor assembly in conjunction with said primary site data; and

said remotely accessible auxiliary site addresses being encoded so as to restrict access by said local processor assembly unless said access is directed by said remote server assembly.

**REMARKS**

This paper is submitted in full response to the outstanding office action of August 28, 2008 in connection with the re-examination of the above-referenced U.S. Patent No. 6,101,534 ("the '534 patent"). As an initial point, newly submitted claims 24 and 25 stand rejected under Section 112, first paragraph as containing new matter. Moreover, all of the re-examined claims stand rejected based upon one or more of the references to Fidelibus et al, Mages et al, Reisman and/or Uranaka, the Patentee noting, with great thanks, the Examiner's very clear and detailed claim chart style discussion of these references as they apply to the claims at issue. Nevertheless, these substantive refusals are respectfully traversed herein.

Looking first, however, to the Examiner's refusal of claims 24 and 25 as containing new matter, the Patentee respectfully disagrees with the Examiner's comments that the benefits of the patented invention would be lost if the user were not physically present, as there are a number of applications, including for example the remote control of a user's local computer using a media player interface in another room so as to achieve the playback of content by the local computer via a television or stereo system in a location remote from the computer itself. Moreover, it is noted that the originally presented claims do not include any limitation whatsoever relating to the user

and/or the users proximity to the local processor, and as such the Patentee asserts such a claim covers a system that functions, as recited in the new claims, regardless of whether the user is physically present at the local processor assembly. Nevertheless, as the clarifying limitation included in newly presented claims 24 and 25 could arguably be considered duplicative of the language of claims 1 and 23, which also do not include a limitation as to the user's location and extend to the same scope, claims 24 and 25 have been cancelled rendering that basis for refusal moot.

As an additional matter, Patentee notes that in accordance with 37 C.F.R. 1.530(i), the present Amendment must be made relative to the patent specification, including the claims, which were in effect as of the date of filing the request for reexamination. However, for purposes of clarity, because claims 24 and 25 previously presented for the first time in Patentee's Preliminary Amendment dated August 29, 2007 are cancelled herein, Patentee's newly added claim is presented herein as independent claim 26 (rather than 24). Independent claim 23, as presented herein is identical to independent claim 23 previously presented for the first time in Patentee's Preliminary Amendment.

We now turn to the substantive refusal of the patented claims and new claim 23 set forth by the Examiner. In so doing,

we focus our discussion on certain claim language common to both of these independent claims, along with new independent claim 26, which represents original dependent claim 2 in independent form. Specifically, each of these claims recited that:

> *said remotely accessible, auxiliary site addresses being structured to be remotely* ***accessed by said remote server assembly so as to initiate utilization*** *of said select portions of said quantity of auxiliary site data by said local processor assembly* ***in conjunction with*** *said primary site data. (Emphasis Added)*

In particular, the Patentee's claimed system very clearly recites that it is the remote server assembly that initiates utilization of the auxiliary site data, and that the use of that data is in conjunction with the primary site data that is on said remote server. As will be described in greater detail subsequently with regard to the references of record, these are two very important features which respectively, help to maintain the security of the local processor assembly, and achieve important real time interactivity between the content at the two locations, while collectively eliminating the potentially time consuming step of requiring that a file be downloaded by the local computer. Moreover, these features are simply not present in the relevant prior art references, whether considered alone, such as in connection with the Section 102 refusals set forth by the Examiner as to claims 1, original claim 2, and 23, or in combination with other references. A discussion of the relevant

references of record as they apply to these features follows.

I. **Mages et al (Applied to claims 1, 2/26 and 23)**.

Mages relates to a system for unlocking a locally maintained 'crippled' file. As the Examiner correctly notes, in the Mages system an un-crippling key file is transmitted from the remote server to the local computer (a process that could take some time if the un-crippling key file is large and/or the connection slow) and once received, software on the local computer combines the key file with the locally maintained 'crippled' file, resulting in playback of that file. (Column 7, Lines 35-45). Significantly, however, under such a circumstance it is not actually the remote server that 'initiates the utilization of' the locally maintained data, but rather it is the un-crippling key file that does so, which is an important distinction that cannot be circumscribed merely by concluding that the remote server sent the key file. In particular, the Mages system, and systems such as Mages that require the local computer to receive a file which then initiates the use of local data, can pose a very serious threat to the security and integrity of the local processor, and defeats the purpose of avoiding potentially slow downloads. For example, in such a system the local processor must open itself to accept, receive and run a file which could have been corrupted, compromised,

intercepted and replaced with another file, or which could have been originally designed as a computer virus, computer trojan, or worm, such that instead of or in addition to functioning to combine with the 'crippled' file to achieve its intended purpose could be configured to significantly compromise and damage the local processor. As is well known, a most significant every day threat to computers are computer viruses, and the primary manner in which these viruses are launched is by an unsuspecting user downloading it, such as via an email attachment, and then running or executing it. As a result, a system such as Mages wherein the remote server merely acts a repository for a file, in this case the un-crippling key file, and then requires the local processor to download the file, the file itself being what initiates the use of the local data, provides a serious security risk in that the file is on the local computer when run, and is vastly different from the Patentee's claimed system wherein it is the remote server itself that initiates the use of the local data, such as by providing the auxiliary site address to the web browser, without the need for any file to be downloaded by the local computer. It is also noted, that using the Patentee's system, the added security of only allowing access to the interchangeable medium versus the computer's main memory, could be implemented in some embodiments, whereas the Mages system requires the main memory of the computer to receive, store and

run the received file. (Column 7, Lines 35-45)

In further support of this distinction that in Mages it is NOT the remote server that initiates the use of the local data, it is also noted that in the Mages system the local computer does not need to be connected with the remote server when use of the local data is initiated. (Column 8, Lines 39-47) Specifically, even though the de-crippling key file may be set to automatically execute and run once fully downloaded by the local computer, this is not required and even if the connection between the remote server and the local computer is severed, the un-crippling key file can thereafter still be run and combined with the crippled file in order to initiate its playback. Furthermore, once the file is de-crippled, it can be run again and again without any interaction with the remote server. (Column 8, Lines 39-47) To this end, because in Mages the combination of the de-crippling key file and the crippled file can take place at any point after the file is downloaded, whether or not a connection between the remote server and local computer is maintained, it is also urged that unlike the Patentee's claimed system, the local data is not used in conjunction with the primary site data, but rather with data maintained on the local computer in the form of a de-crippling key file that has been downloaded at some point in the past. This is also in direct contrast to a stated benefit of the

Patentee's system, which is to eliminate the need to download potentially large files.

Accordingly, it is seen that Mages discloses a security system for unlocking crippled files that merely uses the remote connection as a means to request an unlocking file and download an unlocking file to a local computer. Such a system does not anticipate, teach, or suggest the Patentee's claimed invention. Further, it is noted that the unlocking file may be rather large, and thus would seemingly contradict one benefit of the Patentee's system, namely to reduce download times to the local computer.

**II. <u>Reisman (Applied to independent claims 1 and 23)</u>.**

Looking to Reisman, it is directed towards a system whereby locally maintained content is updated with content from a remote source. As the Examiner points out, however, this involves the local computer 'fetching' new content elements and thereafter using a special "offline browser system" to combine these new content elements with local content elements on a pre-distributed media such as a CD-ROM. Here again, the system of Reisman requires that a file be downloaded and then combined with other content to create more current content, a procedure that in addition to being potentially time consuming if the file is large or the connection slow, can also lead to potentially

very serious security breaches if the file that is fetched/downloaded has been compromised. Thus, the remote server does not actually initiate the use of the local content, but rather if the mere combining of the files is considered use of the local content, it is either the file and/or the "offline browser" referenced by Reisman (see Column 41, Lines 15-42 which were referenced by the Examiner, as well as Lines 42-61), and if use of the local data is considered to be actual use of the content, then it is the user via the local "offline browser" that initiates the use of the local data. In fact, Reisman very clearly states that after a "transporter" fetches the completing elements and content from a remote site, it can be set to disconnect automatically so as to "limit line or access charges" (Column 41, Lines 42-50).

Accordingly, the remote server of Reisman cannot and does not initiate use of the local data, as it need not even be connected with the local computer when that use is initiated. Instead, all the remote server of Reisman does is to transmit, in response to a request, a specific update to the local computer, requiring the local computer to open itself up to receive and run the file from an outside source. Moreover, the locally maintained data in Reisman is not used with primary site data on the remote server, but rather, is used with additional locally stored data in the form of the 'new content element'

that must have been fully downloaded and integrated. Indeed, the downloaded files might be rather large in size and slow to download, such as in the embodiment of an online magazine where the new content may be new articles, photos, advertisements, etc., with the Reisman system specifically designed to avoid the need to stay connected to a remote server for extended periods of time beyond what is required to transmit an update file. Therefore, the Reisman system does not contemplate one benefit of the Patentee's system, namely to reduce download times, as it must still download files before it can function.

Accordingly, based upon the preceding, the reference to Reisman does not and could not anticipate the Patentee's claimed invention as recited in claims 1 and 23 as it is clearly missing significant claimed elements therein.

**III. <u>Urinaka (Applied to independent claim 1 only)</u>.**

Urinaka relates to a remote shopping system which utilizes a locally maintained catalog. In this system, a user browses an online catalog on a DVD, makes certain selections, communicates those selection to a remote server - Step 1402 as correctly referenced by the Examiner - ("as shown in Step 1402, the central control means 1211 of the catalog shopping client 1210 transmits the purchase history information recorded in the purchase history information storage area 1203 together with the

DVD identifying information 1303 to the catalog shopping server 1220 using the information transmitting and receiving means 1212." Col. 19, Lines 7-13 - first reference to step 1402), whereafter the remote server creates a "script" and transmits the script back to the local computer. The "script" is then run and portions of the locally maintained DVD are displayed. (Col. 19, Lines 7-26).

Here again, as with the previous references, Urinaka requires that a "script", essentially a program with a set of instructions, be downloaded by the local computer and then run. Again, unlike the Patentee's claimed system, it is the "script" and not the remote server that initiates the utilization of the local data, a procedure that not only requires the downloading of a file which could be time consuming, but also opens up the local computer to a potentially very serious threat as that script can be compromised or corrupted with viruses, computer trojans, worms, etc. such that when run, significant damage can be done to the local computer.

Further, as with the previously discussed systems, Urinaka does not require the connection to the remote server be in effect when utilization of the local content is initiated as it is the script that is fully downloaded that initiates the use. Additionally, as with the previous systems, the local data is not used in conjunction with the remote data, as a connection

with the remote server and the primary site data need not be in place and to the extent that the script is considered site data, it is maintained on the local computer when implemented.

Thus, Urinaka does not disclose a remote server that initiates the use of the locally maintained data and uses that local data in conjunction with primary site data, and cannot be considered to anticipate claim 1 of the patent.

## IV. **Fidelibus et al (Applied to Claims 1 and 23)**.

Although the Patentee respectfully disagrees with the Examiner's characterization of Fidelibus as it relates to the Patentee's claimed invention, as supported by the attached Declarations of Leigh M. Rothschild ("Dec. Rothschild"), Jay Howard Linn, and supporting evidence, Fidelibus, which was filed April 18, 1997, less than five (5) months prior to the filing date of the Patent at issue, namely September 3, 1997, is not a proper prior art reference.

Specifically, as supported by the Declaration of Jay Linn and the references in the described proceedings to the then already in existence inventions of the Patentee, and the Patentee's own Declaration, Patentee personally conceived of the claimed invention at least as early as April 17, 1997 and worked diligently to its ultimate constructive reduction to practice on September 3, 1997. (Dec. Rothschild, ¶2). In particular,

between October 1996 and December 2003, Patentee was involved in a bankruptcy proceeding with Intracorp Entertainment, Inc. ("Debtor"). (Dec. Rothschild ¶4). A genuine dispute existed as to whether Debtor or Patentee possessed authority to prosecute Patentee's inventions, which, because Debtor was involved in the bankruptcy proceeding, necessarily required the Court's approval before any action or agreement could be undertaken. (Dec. Rothschild ¶5).

At least as early as October 24, 1996, Patentee and Debtor worked diligently with one another, by and through their respective counsel, to obtain authorization from the Court to pursue a patent. Although initially the Court only granted the authority to use cash collateral for purposes of conducting patent searches, thereafter on April 28, 1997 the Court authorized the parties to enter into certain negotiated agreements so as to resolve disputes regarding the invention and/or who had authority and/or control over prosecution of the invention with the PTO. (Dec. Rothschild ¶¶7-11).

As detailed in the attached Declaration of Leigh Rothschild, immediately following court approval to enter into an agreement based upon an initial term sheet, an agreement was negotiated and entered into, culminating in the execution of an Addendum to the Agreement of Settlement in Controversy on June 20, 1997. (Dec. Rothschild ¶12). Thereafter, Patentee began to

diligently prepare and draft documents detailing his inventions for presentation to the undersigned, his personal patent attorney. (Dec. Rothschild ¶13). On or about July 17, 1997, Patentee met with the undersigned and provided disclosure and materials regarding the inventions so that two (2) separate patent applications, including the one that matured into the '534 patent, could be drafted for filing with the PTO. (Dec. Rothschild ¶¶14-15). After receiving the disclosure materials from Patentee, the undersigned worked diligently, taking into consideration the reasonable backlog of unrelated cases, which were taken up in chronological order and carried out expeditiously, until the patent application which led to the '534 patent was completed, reviewed and approved by Patentee, and ultimately filed on September 3, 1997. (Dec. Rothschild ¶16; Dec. Matos ¶4).

Thus, taking into consideration the foregoing, as well as the attached Declarations of Leigh M. Rothschild, Peter A. Matos, and Jay Howard Linn, and all supporting evidence, Fidelibus is sufficiently removed as reference and cannot be considered to anticipate or render obvious any claim of the '534 patent.

## V. <u>Conclusion</u>.

Accordingly, in view of the preceding, the Patentee urges

that new claim 26, namely original claim 2 re-written in independent form, is allowable as the reference to Mages, the sole basis for refusal of original claim 2, does not disclose "auxiliary site addresses being structured to be remotely accessed by said remote server assembly so as to initiate utilization of said select portions of said quantity of auxiliary site data by said local processor assembly in conjunction with said primary site data" as recited in new independent claim 26.

Further, claim 23, which stands rejected only in view of Mages, Reisman and Fidelibus, is also allowable, as the reference to Fidelibus is not a proper reference, and Mages and Reisman do not disclose "auxiliary site addresses being structured to be remotely accessed by said remote server assembly so as to initiate utilization of said select portions of said quantity of auxiliary site data by said local processor assembly in conjunction with said primary site data" as recited in independent claims 23.

Finally, independent claim 1, which stands rejected in view of Mages, Reisman, Urinaka and Fidelibus, is also allowable, as the reference to Fidelibus is not a proper reference, and neither Mages, Reisman nor Urinaka disclose "auxiliary site addresses being structured to be remotely accessed by said remote server assembly so as to initiate utilization of said

F:\MM DOCS\7-GEN\GEN 2007\7062-07 Rothschild\7062 Amendment FILED.doc

select portions of said quantity of auxiliary site data by said local processor assembly in conjunction with said primary site data" as recited in independent claim 1. Further, all of the claims depending therefrom, including claim 22 that is not subject to re-exam, are also allowable.

In the event that any fee may be required by the filing of this paper, an Authorization to Charge Fees to Deposit Account, **Deposit Account No. 13-1227**, is being filed concurrently with this Amendment.

Respectfully submitted,

MALLOY & MALLOY, P.A.
Attorneys for Applicant
2800 S.W. Third Avenue
Historic Coral Way
Miami, Florida 33129
(305) 858-8000

By: ______________________
Peter A. Matos
Reg. No. 37,884

Date: 10/14/08

64811 U.S. PTO
10/17/08


F:\MM DOCS\7-GEN\GEN 2007\7062-07 Rothschild\7062 Amendment FILED.doc

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing document was served upon the following via first class United States Mail, postage prepaid this 14th day of October, 2008.

Van Mahamedi
Shemwell Mahamedi LLP
4880 Stevens Creek Boulevard Suite 201
San Jose, California 95129-1034

Peter A. Matos
Reg. No. 37,884

# Appendix 6



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/008,591 | 04/11/2007 | 6101534 | REX.101 | 7502 |

7590 11/13/2008

Malloy & Malloy
2800 SW Third Avenue
Historic Coral Way
Miami, FL 33129

| EXAMINER | |
|---|---|
| ART UNIT | PAPER NUMBER |

DATE MAILED: 11/13/2008

Please find below and/or attached an Office communication concerning this application or proceeding.



UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

MAILED

NOV 13 2008

CENTRAL REEXAMINATION UNIT

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

Van Mahamedi
Shemwell Mahamedi LLP
4880 Stevens Creek Boulevard, Suite 201
San Jose, CA 95129-1034

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. *90/008,591*.

PATENT NO. *6101534*.

ART UNIT *3992*.

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

| ***Office Action in Ex Parte Reexamination*** | **Control No.**<br>90/008,591 | **Patent Under Reexamination**<br>6101534 | |
|---|---|---|---|
| | **Examiner**<br>FRITZ M. FLEMING | **Art Unit**<br>3992 | |

***-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --***

a☒ Responsive to the communication(s) filed on *14 October 2008* . b☒ This action is made FINAL.
c☐ A statement under 37 CFR 1.530 has not been received from the patent owner.

A shortened statutory period for response to this action is set to expire *1* month(s) from the mailing date of this letter.
Failure to respond within the period for response will result in termination of the proceeding and issuance of an *ex parte* reexamination certificate in accordance with this action. 37 CFR 1.550(d). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**
If the period for response specified above is less than thirty (30) days, a response within the statutory minimum of thirty (30) days will be considered timely.

Part I THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:

1. ☐ Notice of References Cited by Examiner, PTO-892.
2. ☐ Information Disclosure Statement, PTO/SB/08.
3. ☐ Interview Summary, PTO-474.
4. ☐ _____.

Part II SUMMARY OF ACTION

1a. ☒ Claims *1,3-21,23 and 26* are subject to reexamination.

1b. ☒ Claims *22* are not subject to reexamination.

2. ☒ Claims *2,24 and 25* have been canceled in the present reexamination proceeding.

3. ☐ Claims _____ are patentable and/or confirmed.

4. ☒ Claims *1,3-21,23 and 26* are rejected.

5. ☐ Claims _____ are objected to.

6. ☐ The drawings, filed on _____ are acceptable.

7. ☐ The proposed drawing correction, filed on _____ has been (7a)☐ approved (7b)☐ disapproved.

8. ☐ Acknowledgment is made of the priority claim under 35 U.S.C. § 119(a)-(d) or (f).

   a)☐ All b)☐ Some* c)☐ None of the certified copies have

   1☐ been received.

   2☐ not been received.

   3☐ been filed in Application No. _____ .

   4☐ been filed in reexamination Control No. _____.

   5☐ been received by the International Bureau in PCT application No. _____.

   * See the attached detailed Office action for a list of the certified copies not received.

9. ☐ Since the proceeding appears to be in condition for issuance of an *ex parte* reexamination certificate except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte* Quayle, 1935 C.D. 11, 453 O.G. 213.

10. ☐ Other: _____

Fritz M. Fleming
Fritz M. Fleming
Primary Patent Examiner
AU 3992

cc: Requester (if third party requester)

| ***Ex Parte* Reexamination Communication** | **Control No.**<br>90/008,591 | **Patent Under Reexamination**<br>6101534 | |
|---|---|---|---|
| | **Examiner**<br>FRITZ M. FLEMING | **Art Unit**<br>3992 | |

**A SHORTENED STATUTORY PERIOD FOR RESPONSE TO THIS ACTION IS SET TO EXPIRE _1_ MONTH(S) FROM THE MAILING DATE OF THIS LETTER. EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).** If the specified period for response is less than thirty (30) days, a response within the statutory minimum of thirty (30) days will be considered timely.

See attached Office Action.

Fritz M Fleming
Primary Examiner
Art Unit: 3992

cc: Requester (if third party requester)